UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/3/14

————————————————————X

STEPHANIE YVONNE DE LA CRUZ,

        Plaintiff,

    - against -

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

————————————————————X

**OPINION AND ORDER**

**12-cv-3660 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      Stephanie Yvonne De La Cruz brings this action, pursuant to the

Social Security Act (the "Act"),[1] seeking judicial review of a final decision by the

Commissioner of Social Security (the "Commissioner") denying her claim for

Supplemental Security Income ("SSI") disability benefits.  Both parties have

moved for judgment on the pleadings.  For the reasons set forth below, the

Commissioner's motion is granted, the decision denying benefits is affirmed, and

plaintiff's motion is denied.

---

[1]    *See* 42 U.S.C. § 405(g).

## II.    BACKGROUND

### A.    Procedural History

De La Cruz filed an application for SSI disability benefits on June 12, 2008, which was denied on August 22, 2008.[2]  The application alleged that she has been disabled since February 7, 2008, due to depression, dizziness, chest pain, back pain, and acid reflux.[3]  De La Cruz requested a hearing before an Administrative Law Judge ("ALJ"), and ALJ Rosanne M. Dummer presided over a video hearing on November 18, 2009.[4]  De La Cruz, who was represented by counsel, and David A. Festa, a vocational expert, testified at the hearing.  After the hearing, the record was held open for De La Cruz to submit further documentation, which was added to the record.  She also underwent additional psychological evaluation at the request of the New York State Office of Temporary and Disability Assistance.  The ALJ referred the medical evidence of record for further review by a medical expert before issuing a decision on July 16, 2010, finding that De La Cruz is not "under a disability" as defined in the Act.[5]  The ALJ's decision

---

[2]      *See* Transcript of the Administrative Record ("Tr."), filed as part of the Commissioner's Answer pursuant to 42 U.S.C. § 405(g), at 61-76.

[3]      *See id.* at 169, 193.

[4]      *See id.* at 36-60.

[5]      *See id.* at 20-35.

became the final decision of the Commissioner on April 24, 2012, when the

Appeals Council denied De La Cruz's request for review of the ALJ's decision.[6]

On March 2, 2013, plaintiff filed the instant action.  The period at issue is from

June 12, 2008, the date De La Cruz filed her SSI application, through July 16,

2010, when the ALJ issued her decision.[7]

## B.    The Administrative Record

The administrative record consists of non-medical evidence, medical

evidence, and hearing testimony.

### 1.    Non-Medical Evidence

De La Cruz is a childless twenty-six-year-old single woman who

speaks both English and Spanish.[8]  She was born on August 3, 1987, and was

twenty years old at the onset of her alleged disability.[9]  Prior to her alleged

disability, De La Cruz had attended one year of college and had worked in various

---

[6]    *See id.* at 1-3.

[7]    *See* 20 C.F.R. §§ 416.330, 416.335, 416.1481.

[8]    *See* Tr. at 40, 256.

[9]    *See id.* at 61.

customer and food services jobs,[10] but her work never rose to the level of substantial gainful activity ("SGA").[11]  At the ALJ hearing, De La Cruz gave the following testimony.  She was last employed in the first quarter of 2008 in a donut shop.[12]  She left this job due to depression and problems concentrating, focusing, remembering, and interacting with others; she also reported back pain.[13]  De La Cruz recalled being hospitalized as a child for mental problems and stated that she saw doctors at Jacobi Hospital in 2007, who referred her to a psychiatrist and therapist, after her condition worsened around the time of her mother's death in a fire.[14]  She saw Nurse Practitioner Tirza Santilli once a month, who prescribed and managed her medications.  She also saw a therapist weekly, though she had only

---

[10]     *See id*. at 40-41, 56-57, 170, 173.  She stated that she worked part-time from December 2003 to February 2008 as a cashier at a fast food chain and a salesperson in a bookstore.  She reported elsewhere that she had also worked as a cashier/stock person for Target, an office clerk, and a childcare professional for New York City Administration for Children's Services.  *See id.* at 184-191.

[11]     *See id.* at 25.  SGA is work that "involves doing significant physical or mental activity."  20 C.F.R. § 416.972.  For wage-earners, SGA is defined by gross earnings.  *See also* Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), at 3.

[12]     *See* Tr. at 161.

[13]     *See id.* at 41-42, 48, 169.

[14]     *See id.* at 44.  Elsewhere it is noted that plaintiff was seen by Dr. Anant Ahuja at Jacobi Medical Center on January 11, 2008.  *See id.* at 215-217.

been seeing her current therapist for about "a month or two" because her previous one resigned.[15]

She lives with her father, whom she described as a drug addict and schizophrenic.[16]  She drank occasionally and had smoked marijuana – the last time a month before the hearing.[17]  She did very little during the day, staying inside most of the time, and experienced frequent crying spells.[18]  She cooked daily, washed her own laundry, and saw her boyfriend once or twice per week.  She was able to use public transportation by herself, could walk ten blocks at a time, and had no problem standing or using her hands.  She felt she was not ready to return to work and would have trouble getting a regular job.

### 2.    Medical Evidence: Physical Health

#### a.    Consulting Physicians

##### i.    Dr. Sharon Revan (August 14, 2008)

The Division of Disability Determination referred De La Cruz to Dr. Sharon Revan, who performed a physical examination of plaintiff on August 14,

---

[15]    *Id.* at 45-46.

[16]    *See id.* at 50-51.

[17]    *See id.* at 45.

[18]    *See id.* at 52-54.

5

2008.[19]  Dr. Revan diagnosed back pain, as well as acid reflux, headaches, and

dizziness.[20]  The doctor opined that De La Cruz had mild limitations in climbing

stairs due to fatigue, and mild limitations in activities of daily living "depending

[on] her psychological state."[21]  The doctor noted that plaintiff had no limitation

with respect to personal grooming, or in her speech, vision, or hearing.  She also

found no limitation in plaintiff's fine or gross motor activity using her upper

extremities, and no limitation in sitting, standing, or walking distances.[22]

Dr. Revan found that plaintiff had a normal gait and stance.  She could

walk on heels and toes, squat fully, rise from a chair, and get on and off the

examination table without difficulty.  She had full range of motion in her cervical

and lumbar spine as well as in her shoulders, elbows, forearms, wrists, hips, knees,

and ankles, with full strength throughout.  De La Cruz also had intact hand and

finger dexterity, with full grip strength, and her joints were stable and non-tender.

Straight leg raising was negative bilaterally, and her lumbar x-rays were also

---

[19]     *See id.* at 244-248.

[20]     *See id.* at 244.  She also diagnosed depression, anxiety, and insomnia
but stated that De La Cruz would be assessed by a psychologist for these problems.

[21]     *Id.* at 247.

[22]     *See id.*

negative.[23]  De La Cruz reported to Dr. Revan that she had "upper back pain for the past two or three years, [which becomes] worse with crying or when she is depressed and is better with a massage."[24]  She also told Dr. Revan that she tired after climbing three to four flights of stairs, but had no difficulty walking, sitting, standing, or lying down.  She stated that she was able to cook, clean, do laundry, and shop.[25]

### ii.    FEGS (September 2008)

De La Cruz also underwent a "biopsychosocial evaluation" at the Federation Employment and Guidance Service ("FEGS") in connection with an application for public assistance.[26]  During the physical examination, she reported suffering from back pain, for which she took ibuprofen.[27]  Plaintiff also reported that she walked to the appointment, and that she could travel independently on public transportation.  She stated that she was able to perform activities of daily living – including washing dishes and clothes, sweeping, mopping, vacuuming,

---

[23]    *See id.* at 245-247.

[24]    *Id.* at 244.

[25]    *See id.* at 245.  De La Cruz also stated that she had used marijuana and drank alcohol occasionally since the age of fifteen.

[26]    *See id.* at 255-267.

[27]    *See* Tr. at 266.

making a bed, cooking meals, shopping for groceries, bathing, and grooming herself – but that she spends her day at home in bed watching television.[28]

The physical examination was unremarkable except for findings of an "abnormal spine" and "mild mid-thoracic tenderness."[29]  Despite these findings, Dr. Oksana Luke assessed plaintiff's level of mid-back pain during the appointment as one, on a scale from zero to ten, and opined that De La Cruz could stand for four to five hours in an eight-hour day; bend for one to three hours per day; and lift, carry, and push less than ten pounds between ten and fifteen times per hour.[30]

### 3.    Medical Evidence: Mental Health

#### a.    Treating Medical Professionals – Nurse Practitioner Tirza Santilli (August 2008 - October 2009)

From August 2008 to October 2009, De La Cruz was treated by Nurse Practitioner Tirza Santilli at the Clay Avenue Health Center in the Bronx, who monitored plaintiff's psychological condition and managed her medication.[31]

---

[28]    *See id.* at 261.

[29]    *Id.* at 265.

[30]    *See id.* at 265-266.

[31]    *See id.* at 273-295.

Santilli diagnosed De La Cruz with "Major Depressive Disorder, recurrent" at their first meeting on August 18, 2008, though plaintiff rejected medication at that time.[32]  Treatment notes indicate that De La Cruz was feeling "depressed [and] irritable" and experiencing "crying spells, poor sleep, hopelessness, and occasional passive [suicidal] [ideation]," though she reportedly also had adequate impulse control and spontaneous, relevant, and goal-directed thoughts whose content was unremarkable.[33]  At their next meeting on September 17, 2008, Santilli described plaintiff's presentation of symptoms as "[somewhat] contradictory."[34]  On examination, plaintiff's mood was irritable and her affect constricted, and she exhibited tense behavior, an uncooperative attitude, and poor reasoning.  She had clear, challenging speech with an "angry undertone," and was also described as "oddly related."[35]  However, she was well-groomed, with unremarkable psychomotor behavior and fair impulse control, judgment, and insight.[36]  She also had logical, concrete thought processes with unremarkable content, no signs of

---

[32]   Tr. at 277.  Santilli also recorded a history of bipolar disorder (not otherwise specified) and a "rule-out" diagnosis of alcohol and cannabis abuse, though this was omitted in subsequent treatment notes.

[33]   *Id.* at 273, 276.

[34]   *Id.* at 278.

[35]   *Id.* at 279.

[36]   *See id.* at 278.

psychosis or mania, and no suicidal or homicidal ideation.  Her memory was intact, and her intellect was described as average.  The diagnosis was "Recur[rent] Depr[ession] Psych - Severe" and "Personality Disorder [not otherwise specified]," and she was prescribed Lexapro and Ambien.[37]

In October 2008, De La Cruz reported to Santilli of "minimal improvement" in her symptoms, though she admitted that she had not taken her medication.[38]  In November, she claimed to be in compliance with her medication as prescribed and reported improved sleep and mood, though she continued to feel depressed, lonely, and irritable, and was experiencing side effects of occasional daytime sedation and nausea.[39]  In December, she again reported improved sleep and mood, but without medication side effects, and stated that she had started going to church, was getting along with her family, and continued to consider going back to school.  Santilli observed that her mood was "euthymic" and her affect was no longer constricted.  Santilli discontinued the Ambien prescription.[40]

---

[37]    *Id.* at 279.  De La Cruz had previously been prescribed Seroquel by her primary care physician but complained about its side effects.

[38]    *Id.* at 280.

[39]    *See id.* at 282.

[40]    *Id.* at 284.

At her next appointment on February 23, 2009, De La Cruz's mood was "depressed," and she reported having low motivation.[41]  She stopped going to church, had not reapplied for school, and was having problems with her father and boyfriend.  Her speech and affect were otherwise "appropriate," and her attitude cooperative.[42]  In May, plaintiff stated that she had stopped therapy two months earlier, after her therapist resigned, and had run out of medication in April.[43]  She felt depressed and overwhelmed and described occasional crying spells and sleep problems, as well as a recent domestic violence incident with her boyfriend. Santilli re-prescribed Ambien and scheduled an appointment with a new therapist.[44]  In June, De La Cruz reported feeling depressed daily and having low energy and motivation, despite being compliant with her medication and receiving counseling, though her sleep was improved.[45]  Santilli increased her Lexapro dosage and discontinued Ambien once again.[46]  De La Cruz did not see Santilli again until October 2009, even though plaintiff had run out of medication three

---

[41]     *Id.* at 286.

[42]     *Id.*

[43]     *See id.* at 288.

[44]     *See id.* at 289.

[45]     *See id.* at 290.

[46]     *See id.*

months earlier, and presented with a "depressed mood, hypersomulence, low energy, crying spells, and isolation."[47]

On a mental health evaluation form dated October 23, 2009, Santilli confirmed that her patient had "Major Depressive Disorder, recurrent" with signs and symptoms of "depressed mood, low energy, isolation, and crying spells."[48] She indicated that plaintiff's condition would "markedly interfere" with her ability to "[r]espond appropriately to work pressures in a job with simple, repetitive tasks [and to] supervisors and fellow workers" and "[p]erform consistently during the work day without intrusion of mental illness symptoms," but not with her ability to "[u]nderstand, remember, and carry out simple work instructions."[49]

### b.    Consulting Physicians and Psychologists

### i.    Dr. Herb Meadow (July 22, 2008)

Dr. Herb Meadow performed a psychiatric examination on July 22, 2008 at the request of the Social Security Administration ("SSA"), and diagnosed De La Cruz with adjustment disorder with depressed mood.[50]  He noted that his

---

[47]     *Id.* at 292.

[48]     *Id.* at 294.

[49]     *Id.* at 294-295.

[50]     *See id.* at 218-221.

examination findings were consistent with psychiatric problems, but stated that "in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis" and that plaintiff "would be able to perform all tasks necessary for vocational functioning."[51]

De La Cruz described symptoms of "depression with dysphoric mood, crying spells, irritability, low energy, and difficulty concentrating," as well as occasional anxiety.[52]  She declared that she had "no intent to harm herself," but recalled having had suicidal thoughts in the past.[53]  On examination, De La Cruz's mood was depressed, but she was otherwise cooperative and fully-oriented, with an adequate manner of relating and appropriate eye contact.  She was well-groomed, with appropriate, neat, and casual attire.  Her gait, posture, and motor behavior were normal.  Her speech was fluent and clear, her expressive and receptive language skills were adequate, and her thoughts were coherent and goal-directed. There was no evidence of hallucinations, delusions, or paranoia, and her affect was appropriate.  De La Cruz's attention, concentration, and memory were intact, and

---

[51]     *Id.* at 220.  De La Cruz again reported that she is able to complete daily living activities but that she spends the majority of her time watching television, listening to the radio, and reading.

[52]     *Id.* at 218-219.

[53]     *Id.* at 218.

her cognitive functioning was described as average, although her general fund of information was "somewhat limited."[54]

### ii.   FEGS (September 2008)

A team at FEGS, including Dr. Oksana Luke, conducted a "biopsychosocial evaluation" and diagnosed "depressive d[isorde]r."[55]  Her mood appeared "sad" and her affect "constricted," though she was also calm and cooperative.[56]  She reported feeling depressed due to her mother's death the previous year and having problems sleeping, concentrating, and with her memory; she also felt isolated, was unable to experience pleasure from activities she usually found enjoyable, and had a low appetite.[57]  De La Cruz denied current homicidal ideation and hallucinations, and treatment notes also indicate that she denied suicidal ideation.[58]  Plaintiff stated that she could socialize, had friends, and

---

[54]    *Id.* at 219-220.

[55]    *Id.* at 265.

[56]    *Id.*

[57]    *See id.* at 260, 265.

[58]    *See id.*  The issue of suicidal ideation is unclear, since treatment notes also record De La Cruz's statements that she "thinks about suicide all the time," including "jumping from the fire escape, cutting [herself], and jumping in front of oncoming traffic," though she "does not go through with it because she does not want to go to hell."  She also described two previous suicide attempts, including one when she was ten years old, and a more recent attempt in March of 2008 where

obtained emotional support from her sister-in-law, but also that it was "very difficult" to "work, take care of things at home, or get along with other people" due to her psychological state.[59]  Dr. Luke placed restrictions on De La Cruz's ability to be around noise, groups of people, and enclosed spaces.[60]

### iii.    Dr. Howard Tedoff (March 22, 2010)

Psychologist Howard Tedoff examined De La Cruz on March 22, 2010 in response to the New York State Office of Temporary and Disability Assistance's request for an Intelligence Evaluation.[61]  Plaintiff had traveled to the appointment alone, using public transportation.[62]  She wore glasses, but stated that her hearing was adequate and her balance and coordination were fair.  She also stated that her eating habits were inconsistent and she slept poorly, but that her personal grooming and hygiene were normal.  She reported helping her father with

she tied a belt around her neck, though she took it off and did not go to the hospital.  *Id.* at 260.

[59]     *See id.* at 260-261.

[60]     *See id.* at 266.

[61]     *See id.* at 296-302.

[62]     *See id.* at 296.

household maintenance and seeing friends on occasion, but stated that she mostly stays home watching television.[63]

Dr. Tedoff noted that De La Cruz was cooperative, with an adequate manner of relating, social skills, and overall presentation.[64]  Her grooming was adequate, her posture and gait were normal, her eye contact was appropriate, and her speech was intelligible.  Her conversation was interactive, relevant, and goal-directed.[65]  Wechsler Adult Intelligence Scale testing suggested a full scale IQ score of 67.[66]  Dr. Tedoff diagnosed a learning disorder – particularly in math, mildly deficient to borderline intellectual functioning, and insomnia.[67]

Dr. Tedoff wrote that plaintiff was "unable to maintain a regular schedule," that her decision-making skills "seem[ed] to be questionable," and that she "might have difficulty learning and performing complex tasks because of cognitive deficits."  He also stated that her ability to "look for, obtain and sustain

---

[63]     *See id.*

[64]     *See id.* at 297.

[65]     *See id.*

[66]     *See id.* at 298.

[67]     *See id.* at 299.  Testing indicated that De La Cruz reads in terms of word recognition at a junior-high-school level and that her math skills are limited to basic multiplication.  *See id.* at 297.

herself in gainful employment [was] guarded . . . because of her current psychiatric and cognitive issues, as well as an attitude that suggest[ed] she [could not] concentrate or follow instructions effectively."  Dr. Tedoff nonetheless opined that "[r]elative to vocational function[ing], the claimant can follow and understand simple directions and instructions and perform simple tasks, [and h]er attention and concentration skills are up to those tasks."  He further stated, "[s]he has the capacity to relate adequately with others, [but] it remains to be seen if she can deal effectively with stress in the workplace."[68]

Dr. Tedoff also completed a form to assess De La Cruz's mental residual functional capacity ("RFC").[69]  He reported that she had either no limitations or minimal limitations in her ability to understand, remember, and carry out simple instructions, or make judgments on simple work-related decisions.[70]  He assessed mild restrictions in her ability to understand, remember, and carry out complex instructions; make judgments on complex work-related decisions; and interact appropriately with the public, supervisors, and co-workers.[71]  He also

---

[68]     *Id.*

[69]     *See id.* at 300-302.

[70]     *See id.* at 300.

[71]     *See id.* at 300-301.

17

assessed a moderate restriction in her ability to respond appropriately to usual work situations and changes in a routine work setting.[72]  He based his assessments on plaintiff's reported depression, reaction to stress, poor concentration, recent isolation, "intensive" psychiatric care, and history of a suicide attempt.[73]

### c.   Reviewing Physicians

#### i.   Dr. T. Harding (August 20, 2008)

Dr. T. Harding, a state agency review psychologist, reviewed the evidence of record on August 20, 2008, and assessed that plaintiff had mental impairments that were "not severe."[74]

#### ii.   Dr. Stuart Gitlow (May 30, 2010)

On May 30, 2010, psychiatrist Dr. Stuart Gitlow reviewed the medical evidence of record and responded to interrogatories propounded by the ALJ.[75]  Dr. Gitlow graduated from the Mount Sinai School of Medicine at New York University and completed his residency in psychiatry at the University of

---

[72]     *See id.* at 301.

[73]     *Id.*  The report states that she was hospitalized in 1995 and again in 2007 for a suicide attempt.  *See id.* at 297.

[74]     *Id.* at 222.  He only responded to this one question; the rest of the form was blank.  *See id.* at  222-235.

[75]     *See id.* at 313-324.

Pittsburgh.  He is board certified in general psychiatry, addiction psychiatry, and forensic psychiatry.[76]  In assessing De La Cruz's condition, Dr. Gitlow considered the results of Dr. Revan's and Dr. Meadow's examinations, noting that plaintiff's report of a suicide attempt in March 2008 did not appear in the other medical histories provided.[77]

Dr. Gitlow opined that Santilli's report, which indicated the presence of a depressed mood, was "not consistent with anything more than a mild level of symptom severity, one of which would not typically be impairing" and assessed that the limitations Santilli described were not supported by the record, including the relatively conservative treatment provided and relatively mild findings upon examination.[78]  Dr. Gitlow reported that Dr. Meadow's July 2008 evaluation supported the presence of "[n]ormal [b]ereavement," which was "again not typically impairing."[79]  He also concluded that Dr. Revan's August 2008 report indicated no more than a mild impairment in activities of daily living.  Dr. Gitlow opined that the results of Dr. Tedoff's IQ testing did not establish the presence of a

---

[76]     *See id.* at 329.

[77]     *See id.* at 314.

[78]     *Id.* at 314-315.

[79]     *Id.*

psychiatric illness or condition – and could be consistent with depression or marijuana use – because plaintiff had finished both high school and a year of college.[80]  Because he noted that the record did not clearly establish a cause for any impairment, Dr. Gitlow declined to complete a more detailed medical source statement assessing plaintiff's limitations as requested by the ALJ.[81]

### C.    The ALJ's Decision and Analysis

The ALJ applied the five-step sequential process to evaluate De La Cruz's claim.  At step one of her analysis, the ALJ determined that De La Cruz had not engaged in SGA since June 12, 2008.[82]  Next, at step two, the ALJ concluded that claimant's back pain was severe, while her acid reflux and heartburn were not.[83]  However, the ALJ determined that claimant's medically determinable mental impairments, including dysthymia depression, adjustment disorder with depressed mood, anxiety, and insomnia, as well as marijuana use, are not severe because individually or in combination they "do not cause more than minimal

---

[80]    *See id.*  Dr. Gitlow also noted that her file did not include any school records.

[81]    *See id.* at 308, 316, 318.

[82]    *See id.* at 25.

[83]    *See id.* at 25-26.

limitation in the claimant's ability to perform basic mental work activities."[84]   At the third step, the ALJ determined that "[t]aking all of the claimant's impairments alone and in combination, to include those deemed not severe, the impairments of record do not meet or equal any Listing of Impairments."[85]   At step four, the ALJ found that De La Cruz had the RFC "to perform the full range of medium work" as defined by statute.[86]   After summarizing plaintiff's testimony at the hearing and the medical evidence in the record, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that the "overall evidence does not indicate that the claimant's impairments are as severe as alleged or that she is unable to work."[87]   The ALJ found that De La Cruz's mental impairments did not cause more than minimal limitation in her ability to perform basic work activities.  Santilli's treatment notes "appear to indicate mild severity," and Dr. Meadow's diagnosis of adjustment disorder with depressed mood "supports the presence of normal bereavement,

---

[84]      *Id.* at 26.

[85]      *Id.*

[86]      *See id.* at 27.  Medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds.  If someone can do medium work, she can also do light and sedentary work.  *See* 20 C.F.R. § 416.967(c).

[87]      Tr. at 30-31.

21

which is not typically impairing."[88]  Further, Dr. Meadow found that plaintiff's symptoms "[did] not appear significant enough to interfere with the claimant's ability to function on a daily basis."[89]  The ALJ relied heavily on the opinion of Dr. Gitlow, "a medical expert recognized by the Commissioner of Social Security, with a specialty in . . . psychiatry," who concluded that De La Cruz did not have an established medically determinable mental impairment.[90]  Finally, the ALJ concluded that De La Cruz's own statements "concerning the intensity, persistence and limiting effects of [her] symptoms [were] not credible to the extent they [were] inconsistent" with the objective medical evidence.[91]

At the final step of the analysis, the ALJ concluded that claimant's age, education, work experience, and RFC allow her to perform other work in the national economy, which "exists in significant numbers."[92]  Because claimant is a "younger individual" with a high school education and is able to communicate in

---

[88]    *Id.* at 31.

[89]    *Id.*

[90]    *Id.* at 31-32.

[91]    *Id.* at 30.  Furthermore, her credibility as a witness at the ALJ hearing was "poor" and her demeanor was "consistent with the limitations established in her [RFC]."  *Id.*

[92]    *Id.* at 35.  *See id.* at 33.

English, and given the RFC finding for the full range of medium work – which

"includes the functional capacity to perform sedentary, light, and medium work" –

the ALJ determined that De La Cruz "has not been under a disability . . . since June

12, 2008," and denied her claim for benefits.[93]

## III.   LEGAL STANDARD

### A.   Standard of Review

#### 1.   Substantial Evidence Standard

In reviewing an ALJ's decision, a district court does not conduct a de

novo review of the ALJ's decision.[94]  The ALJ must set forth the crucial factors

supporting her decision with sufficient specificity,[95] but a district court must not

disturb the ALJ's decision if "correct legal standards were applied" and

"substantial evidence supports the decision."[96]  "Substantial evidence is 'more than

---

[93]   *Id.* at 33, 35.

[94]   *See Petrie v. Astrue*, 412 Fed. App'x 401, 403 (2d Cir. 2011).  *See also Brickhouse v. Astrue*, 331 Fed. App'x 875, 876 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

[95]   *See McCallum v. Commissioner of Soc. Sec.*, 104 F.3d 353 (Table) (2d Cir. 1996); *Ramos v. Barnhart*, No. 02 Civ. 3127, 2003 WL 21032012, at *6 (S.D.N.Y. May 6, 2003).

[96]   *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  *Accord* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").  *Accord Halloran*,

23

a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[97]

"'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"[98]  Even if there is substantial evidence for the claimant's position, the Commissioner's decision must be affirmed when substantial evidence exists to support it.[99]  Moreover, the Commissioner's findings of fact, as well as the inferences and conclusions drawn from those findings, are conclusive even in cases where a reviewing court's independent analysis of the evidence might differ from the Commissioner's analysis.[100]

───────────────

362 F.3d at 31.

[97]      *Burgess v. Astrue*, 537 F.3d 117, 127-28 (2d Cir. 2008) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  *Accord Halloran*, 362 F.3d at 31; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

[98]      *Tarsia v. Astrue*, 418 Fed. App'x 16, 17 (2d Cir. 2011) (quoting *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999)).

[99]      *See Davila-Marrero v. Apfel*, 4 Fed. App'x 45, 46 (2d Cir. 2001) ("'Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.'") (quoting *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)).  *See also Morillo v. Apfel*, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

[100]     *See Hartwell v. Barnhart*, 153 Fed. App'x 42, 43 (2d Cir. 2005).

24

2.       **Full and Fair Hearing**

However, the reviewing court must be satisfied "that 'the claimant has had a full and fair hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'"[101]  In this regard, the ALJ must affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.[102]  "This duty arises from the Commissioner's regulatory obligations,"[103] which include developing plaintiff's "complete medical history," and making "every reasonable effort" to help the plaintiff get the required medical reports.[104]  This duty "exists even when . . . the claimant is represented by

---

[101]     *Echevarria v. Secretary of Health and Human Services*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Secretary of Health, Education and Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).  *Accord Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999) (citing *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (explaining that the Act must be liberally construed because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits)).

[102]     *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

[103]     *Pratts*, 94 F.3d at 37.

[104]     20 C.F.R. § 404.1512(d).

counsel."[105]  "Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is appropriate."[106]

### B.    Five-Step Process

#### 1.    Physical Impairment

Pursuant to the Act, the SSA has established a five-step sequential process to determine whether a claimant is disabled.[107]  At step one, the ALJ must decide whether the claimant is engaging in SGA.[108]  Generally, if the claimant has earnings from employment above a certain level, she is presumed to be able to engage in SGA and is deemed not disabled.[109]  If the claimant is not engaging in SGA, the analysis continues.

---

[105]    *Pratts*, 94 F.3d at 37 (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).

[106]    *Jones*, 66 F. Supp. 2d at 524 (citing *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999)).  *Accord Richardson v. Astrue*, No. 09 Civ. 1841, 2009 WL 4793994, at *8 (S.D.N.Y. Dec. 14, 2009) ("If the ALJ's rationale could be rendered more intelligible through further findings or a more complete explanation, remand is appropriate.") (citing  *Pratts*, 94 F.3d at 39).

[107]    *See* 20 C.F.R. § 404.1520(a)(4).

[108]    *See id.* § 404.1520(a)(4)(i).

[109]    *See id.* § 404.1520(b).

At step two, the ALJ must determine whether the claimant has a "severe" medically determinable impairment or combination of impairments.[110] An impairment or combination of impairments is severe if it significantly limits the claimant's ability to perform basic work-related activities.[111]  An impairment is not severe when the evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work.[112]  If the claimant has a severe impairment or combination thereof, the analysis must proceed.  If no severe impairment is found, the claimant is deemed not disabled.

At step three, the ALJ determines whether the claimant's impairment meets or medically equals the criteria of a listed impairment.[113]  If the impairment is contained in the Listings, the claimant is considered disabled and the ALJ does

---

[110]     *Id.* § 404.1520(a)(4)(ii).  *See also id.* § 404.1520(c).

[111]     *See id.* §§ 404.1520(c); 404.1521(b) (defining basic work activities).

[112]     *See id.* § 404.1521(a).

[113]     *See id.* Part 404, subpart P, Appendix 1 (hereinafter the "Listings" or "Listing of Impairments").  The Listings define impairments that would prevent an adult, regardless of her age, education, or work experience, from performing any gainful activity, not just SGA.  *See id.* § 404.1525(a) (stating that the purpose of the Listings is to describe impairments "severe enough to prevent an individual from doing any gainful activity").

not reach steps four or five.[114]  If the impairment does not meet the Listings, the analysis continues.

At step four, the ALJ determines the claimant's RFC,[115] which is "the most [claimant] can still do despite [her] limitations," with respect to past relevant work.[116]  In making this finding, the ALJ must consider all of the claimant's impairments, including any "related symptoms, such as pain, [which] may cause physical and mental limitations that affect what [claimant] can do in a work setting."[117]  Then, the ALJ must determine whether the claimant has the RFC to perform any relevant work that the claimant has done in the past.[118]  If the claimant is unable to do any past relevant work, the analysis proceeds.[119]

At the last step of the evaluation, step five, the ALJ must determine whether the claimant's RFC, age, education and work experience allow her to

---

[114]     *See id.* § 404.1520(d), (a)(4).

[115]     *See id.* § 404.1520(e), 404.1545.

[116]     *Id*. § 404.1545(a)(1).

[117]     *See id.*

[118]     *See id.* § 404.1520(f).

[119]     *See id*.

perform any other work in the national economy.[120]  If so, the claimant is not disabled.  But if she is unable to do other work, the claimant is disabled.

In making this determination, the ALJ considers whether a claimant has exertional or non-exertional impairments or a combination of both. "Exertional" limitations affect a claimant's ability "to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)," and "non-exertional" limitations affect the claimant's ability to meet job demands other than those relating to strength.[121]  When a claimant only has exertional limitations, the ALJ makes her disability determination by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"), a matrix of exertional capacity levels and vocational characteristics.[122]  However, "[t]he Grids are inapplicable in cases

---

[120]    *See id.* § 404.1520(g)(1).

[121]    *See id.* § 404.1569a(b), (c)(1) (listing non-exertional impairments: "(i) You have difficulty functioning because you are nervous, anxious, or depressed; (ii) You have difficulty maintaining attention or concentrating; (iii) You have difficulty understanding or remembering detailed instructions; (iv) You have difficulty in seeing or hearing; (v) You have difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching").

[122]    *See* 20 C.F.R. Part 404, Subpart P, Appendix 2.  "Each numbered rule in the appendix resolves the issue of capability to do other work by addressing specific combinations of the factors (*i.e.*, RFC, age, education, and work experience) that determine capability to do work other than that previously performed."  SSR 83-10, 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).  In this

where the claimant exhibits a significant [or non-negligible] non-exertional impairment (*i.e.*, an impairment not related to strength)."[123]

Although the claimant generally continues to have the burden of proving disability, a limited burden of production shifts to the Commissioner at step five.  To support a finding that the claimant is not disabled at this step, the Commissioner must provide evidence demonstrating that other work exists in significant numbers in the national economy that the claimant can perform, given her RFC, age, education and work experience.[124]

### 2.   "Special Technique" Applied to Mental Impairments

---

opinion, I cite to several Social Security rulings; such rulings "are entitled to deference except when they are plainly erroneous or inconsistent with the Social Security Act."  *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995) (quotation marks omitted).

[123]    *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."   A nonexertional impairment is non-negligible "when it so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity.") (quotation marks and alterations omitted).

[124]    *See* 20 C.F.R. §§ 404.1520(g), 404.1560(c).

"[T]he Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments."[125]  The regulations require the application of a "special technique" at steps two and three and at each level of the administrative review process.[126]  The ALJ "must first evaluate [claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [claimant has] a medically determinable mental impairment[.]"[127] If a medically determinable mental impairment is found, the ALJ "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment[ or impairments] and document [her] findings in accordance with paragraph (e) of this section."[128]  The ALJ must then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c),"[129] which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of

---

[125]   *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a).

[126]   *Id.*

[127]   20 C.F.R. § 404.1520a(b)(1).

[128]   *Id.*

[129]   *Id.* § 404.1520a(b)(2).

31

decompensation.[130]  The first three areas are rated on a five-point scale, none, mild, moderate, marked, and extreme; and the fourth area is rated on a four-point scale, none, one or two, three, and four or more.[131]  At step two, "if the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits."[132]  But if the claimant's mental impairment is deemed severe, the ALJ must determine at step three whether the impairment meets or equals the severity of a mental disorder identified in the Listings.[133]  The ALJ's written decision must reflect application of the technique, including "a specific finding as to the degree of limitation in each of the" four functional areas.[134]  Finally, an analysis under the

---

[130]    *Id.* § 404.1520a(c)(3).  "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Kohler*, 546 F.3d at 266 n.5 (quotation marks omitted).

[131]    *See* 20 C.F.R § 404.1520a(c)(4).

[132]    *Kohler*, 546 F.3d at 266 (quoting 20 C.F.R. § 404.1520a(d)(1)).

[133]    *See* 20 C.F.R. § 404.1520a(d)(2).

[134]    *Id.* §  404.1520a(e)(2).  *See id.* § 416.920a(e)(4) ("The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).").

four broad categories is not a substitute for an RFC determination, which requires a more detailed assessment.[135]

### C.    Medical Sources and the "Treating Physician" Rule

"The term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources.'"[136]  Medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.[137]  Medical sources who are *not* acceptable medical sources include nurse practitioners, physician assistants, as well as other sources.[138]

Only acceptable medical sources can be relied on to establish the existence of a medically determinable impairment or be considered treating sources whose opinions are entitled to controlling weight under the "treating physician" rule.[139]  Under the "treating physician" rule, "the medical opinion of a claimant's

---

[135]    *See, e.g.*, *Golden v. Colvin*, No. 12 Civ. 665, 2013 WL 5278743, at *3 (N.D.N.Y. Sept. 18, 2013).

[136]    SSR 06-03p, 2006 WL 2329939, at *1 (S.S.A. Aug. 9, 2006) ("SSR Medical Sources") (citing 20 C.F.R. §§ 404, 1512, 416.912).

[137]    *See id.*

[138]    *See id.* at *2.

[139]    *See id.* at *2-3.

treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence."[140]  When a treating physician's opinion is not given controlling weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive.  These factors include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist.[141]  After considering the above factors, the ALJ must "'comprehensively set forth [her] reasons for the weight assigned to a treating

---

[140]     *Shaw v. Carter*, 221 F.3d 126, 134 (2d Cir. 2000) (citing 20 C.F.R. § 416.927(d)(2)).  *Accord* 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").  "Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health."  *Roman v. Astrue*, No. 10 Civ. 3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) (citing *Canales v. Commisioner of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010)).

[141]     *See* 20 C.F.R. § 404.1527(d)(2).

34

physician's opinion.'"[142]   Failure to provide "'good reasons for not crediting the

opinion of a claimant's treating physician'" is grounds for remand.[143]

While information from medical sources that are not acceptable

medical sources cannot establish the existence of an impairment and are not subject

to the treating physician rule, the information and opinions they provide are

relevant when assessing the severity of an impairment and a claimant's RFC.[144]

Indeed,

> [w]ith the growth of managed health care in recent years and the
> emphasis on containing medical costs, medical sources who are
> not "acceptable medical sources," such as nurse practitioners,
> physician assistants, and licensed clinical social workers,
> have increasingly assumed a greater percentage of the treatment and
> evaluation functions previously handled primarily by physicians
> and psychologists.  Opinions from these medical sources, who are
> not technically deemed "acceptable medical sources" under our
> rules, are important and should be evaluated on key issues such as

---

[142]   *Newbury v. Astrue*, 321 Fed. App'x 16, 17 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33).  *See also* 20 C.F.R. § 404.1527(d)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion").

[143]   *Newbury*, 321 Fed. App'x at 17 (quoting *Snell*, 177 F.3d at 133). *Accord Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reason' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

[144]   *See* SSR Medical Sources, 2006 WL 2329939, at *2-3.

impairment severity and functional effects, along with the other relevant evidence in the file.[145]

In addition, it may be appropriate to give more weight to the opinion of such a medical source where "she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation" for her opinion.[146]

## D.   Claimant Credibility

An ALJ is permitted to consider an individual's activity level in making a determination of credibility.  The ALJ will consider "all of the medical and non-medical information in determining credibility."[147]  Additionally, while "'[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability,'"[148] the ALJ "'is not required to accept the claimant's subjective complaints without question; [s]he may exercise

---

[145]   *Id.* at *3.

[146]   *Id.* at *4.

[147]   20 C.F.R. § 404.1529(c)(3)(i).  *See also Rosado v. Shalala*, 868 F. Supp. 471, 472-73 (E.D.N.Y. 1994) (holding that an ALJ may rely on a claimant's activities of daily living as substantial evidence in support of his determination).

[148]   *Montaldo v. Astrue*, No. 10 Civ. 6163, 2012 WL 893186, at *17 (S.D.N.Y. Mar. 15, 2012) (quoting *Horan v. Astrue*, 350 Fed. App'x 483, 485 (2d Cir. 2009)).

discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'"[149]  In weighing the credibility of the claimant's testimony, her work history is just one of many factors the ALJ may consider.[150]

## IV.   DISCUSSION

### A.   The ALJ Applied the Correct Legal Procedures and Her Findings Are Supported by Substantial Evidence

#### 1.   The ALJ Gave Appropriate Weight to Dr. Tedoff's Findings

Dr. Tedoff concluded that De La Cruz's prognosis for obtaining and maintaining employment is "guarded" because of her psychiatric and cognitive issues.[151]  De La Cruz argues that it was error for the ALJ to place little weight on Dr. Tedoff's findings based on Dr. Gitlow's suggestion that the IQ results were inconclusive because they only showed "the patient's condition in a narrow slice of time" and were not "part of a longitudinal picture that could give the results added meaning," such as a "medical/psychiatric workup."[152]  According to De La Cruz,

---

[149]     *Id.* (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)).

[150]     *See id.* (citing *Schaal*, 134 F.3d at 502).

[151]     Tr. at 299.

[152]     Pl. Mem. at 21 (quotation marks omitted).

Dr. Tedoff's findings demonstrated that the "record needed to be augmented" to develop this longitudinal picture.[153]

These arguments are unavailing. *First*, the ALJ did not err in placing limited weight on Dr. Tedoff's findings because they were inconsistent with the medical evidence, De La Cruz's past educational and employment history,[154] the substance of her testimony, and her demeanor while testifying. For example, as Dr. Tedoff recognized, the intelligence scores were "not consistent with her alleged year of college and reading levels in terms of work recognition."[155] Nor were they

---

[153]    *Id.*

[154]    For example, De La Cruz worked at a bookstore as a cashier and also organized the books on the shelves and in the stockroom. *See* Tr. at 56 (stating that she thought she was "good" at the job but that she was not retained because the work was "seasonal"). She also completed high school and one year of college, and did not report any difficulty while in school. *See id.* at 40, 173.

[155]    *Id.* at 298.

consistent with Dr. Meadow's evaluation;[156] Dr. Revan's evaluation;[157] Santilli's

opinion and treatment notes;[158] or the FEGS records.[159]

       *Second*, the ALJ made a reasonable effort to develop the record, and

De La Cruz failed to submit evidence to support Dr. Tedoff's findings.  Prior to the

hearing, the ALJ advised De La Cruz of her right to obtain and present evidence.[160]

The "Disability Worksheet" shows that multiple attempts were made to obtain

---

[156]    *See id.* at 218-221.  Dr. Meadow concluded both that De La Cruz's mental impairments were not severe and that she would be able to perform "all tasks necessary for vocational functioning."  *Id.* at 220.  This opinion is supported by his examination notes, which indicated, among other things, that plaintiff had adequate language skills and manner of reporting, "average" cognitive functioning, and intact memory, attention, and concentration.  *Id.* at 219.  The opinion of examining physicians may constitute substantial evidence.  *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (holding that opinion of examining physician constituted substantial evidence that outweighed opinion of treating nurse).  *See also Brown v. Commissioner of Soc. Sec.*, No. 13 Civ. 827,  2014 WL 783565, at *18 (S.D.N.Y. Feb. 28, 2014) ("The ALJ properly concluded that Dr. Meadow's opinion constituted evidence substantial and sufficient to contradict the opinion of Dr. Adams.") (quotation marks and alterations omitted).

[157]    *See, e.g.*, Tr. at 247 (De La Cruz has only mild limitations with respect to her activities of daily living).

[158]    For example, Santilli's notes reflect that De La Cruz was a "straight A student" in college with no history of special education, and she repeatedly found that De La Cruz had an "average" intellect.  *Id.* at 275, 280, 282, 284, 286, 288.

[159]    *See, e.g., id.* at 261 ("[De La Cruz] reports that she is able to complete all her [activities of daily living]. [De La Cruz] reports that she enjoys writing.").

[160]    *See id.* at 140-141.

medical records from De La Cruz's treating sources.[161]  Furthermore, at the

conclusion of the hearing before the ALJ, the record was held open for De La Cruz

to submit additional medical records from the therapists and other medical sources

she identified at the hearing.[162]  However, on February 10, 2010, De La Cruz's

attorney only mailed Santilli's treatment notes to the ALJ, and did not mention

whether he made an effort to obtain records from other sources.[163]  Moreover, on

July 16, 2010, a month before she issued her decision, the ALJ held the record

open a second time, for the specific purpose of providing De La Cruz an

opportunity to respond to the Tedoff and Gitlow materials.  The ALJ's letter

explained that De La Cruz could request a supplemental hearing to present

additional evidence and ask the ALJ to issue subpoenas for the production of

witnesses and records.[164]  However, there is no indication that De La Cruz or her

counsel followed up on this invitation.  Notwithstanding the ALJ's duty to develop

---

[161]     *See id.* at 249-254.

[162]     At the hearing, the ALJ asked De La Cruz's counsel to obtain records
from the therapists reflected in Nurse Santilli's notes.  *See id.* at 43, 46.  De La
Cruz's counsel said that he would submit additional reports in two weeks.  *See id.*
at 60.  The ALJ said that she would review the submission of additional materials
and "take under advisement what additional development, if any, is required."  *Id.*

[163]     *See id.* at 271.

[164]     *See id.* at 212-213.

the record, the Commissioner's Regulations explicitly place the burden of

supplying all relevant medical evidence on the claimant.[165]  There is no excuse for

De La Cruz's failure to submit records and opinions, including in response to Dr.

Tedoff's findings or Dr. Gitlow's opinion characterizing those findings.[166]  In

short, the ALJ adequately explained the basis for placing limited weight on Dr.

Tedoff's findings and the ALJ's conclusions are otherwise supported by substantial

evidence.

### 2.    The ALJ Considered Nurse Santilli's Notes and Opinion and Dr. Luke's Findings

De La Cruz contends that the ALJ failed to consider relevant

evidence, arguing that the "record contains multiple evaluations [ ] showing

impairing mental conditions," including Nurse Santilli's clinical notes, diagnoses,

---

[165]    *See* 20 C.F.R. §§ 404.1512, 416.912(c).

[166]    *See, e.g.*, *Weingarten v. Apfel*, No. 98 Civ. 2475, 1999 WL 144486, at *4 (S.D.N.Y. Mar. 17, 1999) (finding that the ALJ "made every reasonable effort to fully develop the record" where he "consented to plaintiff's attorney's request to keep the record open one week after the hearing to enable the attorney to submit any additional information"); *Robinson v. Chater*, No. 94 Civ. 0057, 1996 WL 5067, at *7 (S.D.N.Y. Jan. 5, 1996) ("[T]he ALJ twice informed [claimant's] representative that the record would be kept open in order for new medical records to be submitted.  When claimant's representative indicated that he would attempt to locate the document within three weeks after the hearing, and that he would contact the ALJ if he were not able to do so, the ALJ was under no further obligation.").

and functional capacity statement, and Dr. Luke's diagnosis of depressive disorder.[167]   However, the ALJ considered each of these sources.

As a threshold matter, the ALJ properly disregarded Santilli's opinion when considering whether De La Cruz had a medically determinable mental impairment because, as a nurse practitioner, Santilli is not an acceptable medical source.[168]   At the same time, the ALJ considered Santilli's records throughout her decision, including at step two when determining the severity of De La Cruz's mental impairments,[169] and at step four when assessing De La Cruz's RFC.[170]   With respect to severity, the ALJ, relying on Dr. Gitlow's opinion, determined that Santilli's treatment notes indicated only mild severity.[171]   With regard to RFC, the ALJ found that Santilli's opinion, which placed significant limitations on De La Cruz's ability to perform work, was "completely inconsistent with the treatment notes provided," as well as the other evidence in the file.[172]

_____

[167]   Pl. Mem. at 14-15.

[168]   *See* SSR Medical Sources, 2006 WL 2329939, at *2-3.

[169]   *See* Tr. at 26.

[170]   *See id.* at 30-31.

[171]   *See id.* at 31, 314.

[172]   *Id.* at 31.

The ALJ's determinations are well supported by the record.  Nurse Santilli's treatment notes reflect primarily unremarkable examination findings throughout the relevant period.  For example, at her first appointment in August 2008, plaintiff had spontaneous, relevant, and goal-directed thought with unremarkable content.[173]  The following month, De La Cruz presented with "unremarkable . . . psychomotor behavior[,]" "intact" memory, and "clear" "sensorium," as well as "logical, concrete" thought processes with "unremarkable . . . content," "no signs of mania . . . or psychosis," and no suicidal or homicidal ideation.[174]  In December 2008, De La Cruz's "mood [was] euthymic," she had "intact" memory, "logical" thought processes, and "appropriate" appearance, speech, and affect.[175]  In addition, Santilli found that De La Cruz's condition would not interfere markedly with her ability to understand, remember, and carry out simple work instructions, which is consistent with the ALJ's determination that De La Cruz can perform basic work activities.[176]  Accordingly, Santilli's treatment notes tend to support, rather than undermine, the ALJ's conclusions.  Thus, the

---

[173]    *See id.* at 276.

[174]    *Id.* at 278.

[175]    *Id.* at 284-285.

[176]    *See id.* at 294.

ALJ properly considered Santilli's opinion, but found it to have little value because it was contradicted by her own contemporaneous treatment notes.[177]

De La Cruz also argues that the ALJ erred in finding that De La Cruz was "'seen infrequently, and was not referred to a psychiatrist for evaluation, consultation, or treatment.'"[178]  De La Cruz contends that "[a]ppointments were missed [ ] not because of a cavalier attitude . . . about treatment, but because of dislocations in treatment caused by staff changes and, in part, by feelings of helplessness and discouragement that are part of [her] diagnosed condition."[179] She also points out that Santilli's treatment notes indicate that in addition to seeing Santilli, De La Cruz was getting weekly therapy from other sources.[180]   However, De La Cruz does not explain how these alleged oversights impact the ALJ's specific findings, and the ALJ's decision demonstrates a close review of Santilli's

---

[177]     *See, e.g.*, SSR Medical Sources, 2006 WL 2329939, at *4 (indicating that the weight given to the opinion of a medical source that is not an acceptable source depends on whether the medical source "has seen the individual more often than the treating source *and has provided better supporting evidence and a better explanation*" for her opinion) (emphasis added).

[178]     Pl. Mem. at 22 (quoting Tr. at 31) (alterations omitted).

[179]     *Id.*

[180]     *See id.* at 23 ("Records show, then, that Ms. De La Cruz was scheduled to be seen once a month by NP Santilli for medication management, but also was seen weekly for psychotherapy at another treatment source.").

treatment notes, making it unlikely that the ALJ simply failed to take note of the fact that De La Cruz was receiving weekly therapy.  In fact, during the hearing before the ALJ, De La Cruz testified at length about her therapy sessions,[181] at one point describing them as "couples therapy" for her and her boyfriend.[182]  Moreover, De La Cruz failed to provide medical records from these sources, and the ALJ's opinion is otherwise supported by ample evidence.

With respect to Dr. Luke, the ALJ not only *considered* her findings, but *relied on them* when concluding that Santilli's opinion was contradicted by Dr. Luke's "preliminary restrictions."[183]  While the ALJ does not specifically refer to Dr. Luke's diagnosis of depressive disorder (or depression) at step two, she found that De La Cruz's medically determinable mental impairments included both dysthymia depression and adjustment disorder with depressed mood.[184]  De La

---

[181]     *See* Tr. at 41-47.

[182]     *Id.* at 44.

[183]     *Id.* at 31.

[184]     *See, e.g.*, *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("'[A]n ALJ is not required to discuss every piece of evidence submitted.'") (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)); *id.* ("An ALJ does not have to state on the record every reason justifying a decision.").

Cruz has failed to explain how these impairments are inconsistent with Dr. Luke's diagnosis.[185]

Thus, I find that the ALJ examined all the relevant sources.  In doing so, she determined that they did not support a finding of either a severe mental impairment or an RFC inconsistent with the full range of medium work.  Mere disagreement with those findings is insufficient to overturn the ALJ's decision.[186]

### 3.   The ALJ Gave Appropriate Weight to Dr. Gitlow's Opinion

---

[185]   Dr. Luke found that De La Cruz had "depressive disorder," not "major depressive disorder."  The diagnosis of "depressive disorder NOS" is assigned to "disorders with depressive features that do not meet the criteria for Major Depressive Disorder, Dysthymic Disorder, Adjustment Disorder With Depressed Mood, or Adjustment Disorder With Mixed Anxiety and Depressed Mood." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 381 (4th ed. 2000).  "Major depressive disorder" is characterized by one or more major depressive episodes, which are "period[s] of at least 2 weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities." *Id.* at 369, 349.  "Dysthymic disorder" is characterized by "chronically depressed mood that occurs for most of the day more days than not for at least 2 years."  *Id.* at 376.  "During periods of depressed mood, at least two of the following additional symptoms are present: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness."  *Id.*

[186]   *See Brault*, 683 F.3d at 448 ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'") (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis in *Brault*).

The opinions of consultants such as Dr. Gitlow are entitled to considerable weight.[187]  De La Cruz argues that Dr. Gitlow gave insufficient weight to Santilli's opinion and that his opinion was based on the erroneous assumption that "De La Cruz had never been diagnosed with a serious mental illness by an M.D. or psychologist," ignoring Dr. Luke's diagnosis and findings.[188]  However, as discussed earlier, there is no basis to disturb the ALJ's determination that Santilli's opinion was neither supported by her treatment notes nor the record.[189]  Nor did Dr. Gitlow overlook Dr. Luke's report in his opinion.  He indicated that while the report stated that "the claimant tried to kill herself [recently]; this is not, however, revealed in the [other] histories [provided]."[190]  Moreover, as noted, De La Cruz has not explained how Dr. Luke's diagnosis of depressive disorder is otherwise inconsistent with the record evidence or the ALJ's determinations that De La Cruz's mental impairments were not severe and that she could perform the full

---

[187]     *See* 20 C.F.R. § 416.927(e)(2)(I); *Diaz v. Shalala*, 59 F.3d 307, 313 n.6 (2d Cir. 1995) (stating that the opinion of non-examining sources may override a treating physician's opinion when supported by evidence in the record).

[188]     Pl. Mem. at 17-19.

[189]     *See supra* Part IV.A.2.

[190]     *See* Tr. at 314.

range of medium work.[191]   Accordingly, I find that the ALJ did not err in giving

Dr. Gitlow's opinion substantial weight.

>    **C.    The ALJ's Determination that There Are Jobs that Exist in
>            Significant Numbers in the National Economy that Plaintiff Can
>            Perform Is Based on Substantial Evidence**

De La Cruz argues that the ALJ should have found that she could not

sustain employment based on the vocational expert's opinion with respect to a

hypothetical worker who was restricted to "'simple work involving one or two step

tasks [and] involving brief but superficial contact with others.'"[192]   However, the

ALJ determined that De La Cruz did not have these restrictions based on the record

---

[191]     *See supra* Part IV.A.2.  Dr. Luke's opinion is not inconsistent with the
medical evidence in the record, and in any event only places minor limitations on
De La Cruz's functional capabilities.  One reasonable inference that can be drawn
from Dr. Gitlow's opinion is that he did not find Dr. Luke's diagnosis persuasive
because it was based in part on the unsubstantiated claim that De La Cruz had
recently tried to kill herself, a claim Dr. Gitlow dismissed as inconsistent with all
the other medical evidence and De La Cruz's testimony.  *See id.* at 265 (Dr. Luke's
diagnosis of "depression" is based on "history of suicidal attempts" including "last
year after [her] mother's death").  Another reasonable inference is that because Dr.
Gitlow concluded that Dr. Meadow's July 2008 diagnosis was more consistent
with normal bereavement, he reached the same conclusion with respect to Dr.
Luke's earlier March 2008 diagnosis.  *See id.* (Dr. Luke indicates that De La Cruz
is "depressed due to her mother['s] illness and death last year" and that she "has
depressive d[isorde]r since her mother passed away last year").

[192]     Pl. Mem. at 24 (quoting Tr. at 58).

evidence discussed throughout this opinion,[193] and there is no basis to disturb this finding.[194]  Accordingly, the ALJ did not err in rejecting a comparison between De La Cruz and this hypothetical worker.

## V.    CONCLUSION

For the foregoing reasons, the Commissioner's motion is GRANTED, the decision denying benefits is affirmed, and De La Cruz's motion is DENIED. The Clerk of Court is directed to close these motions [Docket numbers 16 and 30], and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:  New York, New York
        July 2, 2014

---

[193]    For example, Dr. Meadow found that De La Cruz was able to perform calculations and serial threes, and could repeat three out of three objects immediately and after five minutes. *See* Tr. at 219.  He also noted that De La Cruz rode public transportation by herself to the appointment, which suggests that claustrophobia does not impact De La Cruz's activities of daily living. *See id.* at 218.  De La Cruz also took public transportation to the hearing and to her appointment with Dr. Tedoff and reported during her FEGS evaluation that she was able to take public transportation. *See id.* at 26, 296, 261.

[194]    *See Brault*, 683 F.3d at 448.

**- Appearances -**

**For Plaintiff:**

William Gottlieb, Esq.
Axelrod and Gottlieb
101 Lafayette Street, Suite 304
New York, NY 10013
(212) 431-8073

**For Defendant:**

Susan D. Baird
Assistant United States Attorney
86 Chambers Street, 3rd fl.
New York, NY 10007
(212) 637-2713